UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-61285-CIV-DIMITROULEAS/SNOW

KENNETH J. PINKNEY,

     Plaintiff,

     vs.

KILOLO KIJAKAZI,
Acting Commissioner of Social
Security Administration,

     Defendant.

_____/

## AMENDED REPORT AND RECOMMENDATION

This cause is before the Court on Plaintiff's Complaint seeking judicial review of a final decision of the Social Security Administration denying the Plaintiff's application for disability benefits. The Complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et seq., and was referred to United States Magistrate Judge Lurana S. Snow for Report and Recommendation.

## I. PROCEDURAL HISTORY

The Plaintiff filed an application for Supplemental Security Income (SSI) benefits on March 21, 2017, alleging disability since June 8, 2008 as a result of pain in his back and hand, as well as mental impairments. The application was denied initially and upon reconsideration. The Plaintiff then requested a hearing, which was held before Administrative Law Judge Jose Perez-Gonzalez on November 27, 2018. A supplemental hearing was conducted on June 4, 2019. The Administrative Law Judge (ALJ) found that the Plaintiff was not disabled within the meaning of the Social Security Act. The Appeals Council denied the Plaintiff's

request for review on  July 17, 2019.  The Plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

## II. FACTS

The Plaintiff was born on October 6, 1976 and was 40 years old on the date he applied for SSI benefits.  He has a seventh grade education and has never engaged in substantial gainful activity.  Because the issues raised by the Plaintiff in his Complaint solely relate to the ALJ's assessment of his mental impairments, the facts outlined in this Report likewise will deal with the medical record as it pertains to those impairments.

### A.  Treatment Records

The Plaintiff received mental health treatment from Henderson Behavioral Health, with his first visit on October 13, 2016, when he was diagnosed with (1) Major Depressive Disorder, Recurrent, Severe and (2) Cocaine Dependence. Mental status examination conducted by Hernan Pabon, M.D., on November 9, 2016, revealed that the Plaintiff was cooperative and oriented in all spheres; speech was normal; affect was appropriate; mood was anxious and depressed; thought process was spontaneous and goal directed; thought content included delusions; intellectual functioning was above average with no memory impairment; concentration was adequate, but with little or no insight, and social judgment was adequate.  The Plaintiff reported depressed mood; decreased sleep, energy, interest and appetite; feelings of guilt; lack of concentration, and psychomotor retardation.  Dr. Pabon's assessment was Major Depressive Disorder with psychosis.  He prescribed risperidone and fluoxetine, and instructed the Plaintiff to abstain from cocaine and attend Narcotics Anonymous (NA) meetings.  (R:440-41, 447)

On December 8, 2016, the Plaintiff told Heydi L. Gonzalez, M.S., that he had been referred by the court for examination. He had been arrested the preceding

September for possession of drugs with intent to sell and the preceding November for resisting arrest without violence.  Mental status assessment revealed that the Plaintiff was cooperative, related well and was fully oriented; speech was normal; affect was blunted; mood was euthymic (normal); thought process was spontaneous; continuity of thought was relevant and goal directed; abstract thinking was adequate; thought content included paranoid delusions; intellectual functioning was average with no memory impairment; concentration was adequate; insight was fair, and social judgment was moderately impaired.  The Plaintiff reported a history of cocaine use, most recently two weeks earlier.   His treatment plan involved medication management.  (R:437-39)

On January 1, 2017, the Plaintiff was involuntarily committed to Plantation General Hospital with diagnoses of acute psychosis, suicidal ideation and elevated creatine kinase.  Drug screen was positive for cocaine and cannabinoids.  He remained hospitalized until January 18, 2017.  (R: 481-766)

The next treatment note from Henderson was on May 23, 2017.  It listed the following problems, all of which were assessed as stable or improved: severe major depression with psychotic features; mood swings; anxiety, and hallucinations.  Mental status examination revealed that the Plaintiff had coherent speech; logical thought process; intact associations and orientation; fair recent or remote memory; fair attention and concentration; good language and fund of knowledge, and fair judgment. The Plaintiff was well groomed and his mood was depressed.  The Plaintiff reported auditory hallucinations (voices telling him to do things), but denied visual hallucinations, suicidal or homicidal ideations or delusions.  He also denied substance use or abuse.  Rexulti was prescribed.  (R:461)

3

On July 25, 2017, the Plaintiff reported that he continued to experience depression and heard voices, but the medications were helping him somewhat.  On October 4, 2017, the Plaintiff again stated that the medications were helping him.  On May 17, 2018, a treatment note stated that the Plaintiff was discharged owing to multiple missed appointments, despite repeated re-scheduling since February 16, 2018. (R:458-60)

The Plaintiff returned to Henderson on September 20, 2018.  He reported a history of hearing voices, as well as paranoia.  He denied delusions, and stated that medication had made him feel more calm and able to cope better with the voices, as well as less depressed. The Plaintiff also reported a history of substance abuse, with his last cocaine use about two weeks earlier. Since beginning his medication, the Plaintiff was able to handle the activities of daily living.  He had several adult arrests since 1994 and was incarcerated for a total of 11.5 years.  The Plaintiff had been convicted of aggravated assault as well as numerous offenses involving possession with intent to sell illegal substances.  The Plaintiff was on probation until 2021 and a possession charge from September 2016 was pending.  Mental status examination revealed that the Plaintiff was cooperative and oriented in all spheres; speech was normal; affect was appropriate; mood was depressed; continuity of thought was circumstantial; thought content included paranoia; intellectual functioning was below average; memory was not impaired; insight was fair, and social judgment was adequate. The Plaintiff was diagnosed with Major Depressive Disorder, single episode, severe with psychotic features, and his treatment plan included medication management. (R:447, 455-57)

On October 11, 2018, the Plaintiff stated that he had a history of using cocaine and marijuana, but had been clean for two years and was attending Narcotics

Anonymous meetings.  He also reported that he had been treated at Henderson in 2017, but had stopped taking his medications in February 2018.  The evaluator indicated that the Plaintiff needed to continue with therapy.  Rexulti was re-started and Prozac also was prescribed.  (R:450-51)

On January 10, 2019, the Plaintiff reported that he was still hearing voices, but was feeling less depressed and was sleeping better.  The only listed problem in the treatment note was severe major depression with psychotic features.  Mental status examination revealed coherent speech; logical thought process; intact associations and orientation; fair recent or remote memory; fair attention and concentration; fair language; poor fund of knowledge; calm mood, and fair judgment. The Plaintiff's Rexulti dosage was increased and he was continued on Prozac.  (R:480)

B. <u>Medical Opinions</u>

1. <u>Consultative Examination by Adele Besner, Psy. D.</u>

A consultative psychological examination of the Plaintiff was performed by Adele Besner, Psy. D., on November 14, 2016.  The Plaintiff reported that he suffered from depression and sleeplessness, and that he constantly heard the voices of his dead mother and brother.  He also reported that he had been using cannabis and cocaine on a daily basis since the age of 26.  The Plaintiff stated that he was unable to bathe or dress without assistance, and could not shop, cook or clean house.  (R: 391-92)

Dr. Besner observed that the Plaintiff "presented as an individual who is experiencing significant emotional difficulties." (R: 392)  He was friendly and cooperative, and rapport was easily established.  The Plaintiff's speech was organized and easy to understand, but tangential and he at times made statements that had no logical sense.  The Plaintiff limited himself to answering questions, but his eye contact was good and he endeavored to answer all questions. His task persistence was variable

as he sometimes appeared to be in a fog, and he adapted to changes in task with some difficulty.  The Plaintiff appeared to put forth his best effort on all tasks.  His mood was depressed with flat affect.  Id.

Dr. Besner's assessment of the Plaintiff's mental status was he had limited insight and poor judgment, but denied any suicidal or homicidal thoughts and did not exhibit any perceptual disturbances or hallucinations during the evaluation. The Plaintiff was oriented to person, place and time.  Immediate and recent memory was poor and remote memory was limited.  His fund of general knowledge was poor, as was abstract thinking.  The Plaintiff was unable to complete simple single-digit calculations.  (R: 393) Dr. Besner's assessment of the Plaintiff's ability to work was that "he may not be able to perform some of the duties required by the workplace." Id. Additionally, the Plaintiff's "current emotional state and low cognitive abilities may affect his ability to perform at this time." Id.  The doctor noted that the Plaintiff was not receiving any services, but if he began to receive assistance, his current prognosis was guarded.  Id.

2. State Agency Consultants

On May 6, 2017, state agency non-examining psychologist, Catharina Eeltink, Ph.D., completed a Mental Residual Functional Capacity Assessment of the Plaintiff.  In the area of understanding and memory, Dr. Eeltink found that the Plaintiff had no significant limitations in the abilities to remember locations and work-like procedures and to understand and remember very short and simple instructions, but was moderately limited in the ability to understand and remember detailed instructions.  In the area of concentration and persistence, the Plaintiff had no significant limitations in the abilities to carry out very short and simple instructions; sustain an ordinary routine without special supervision, and make simple work-related

decisions, but moderate limitations in the abilities to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. In the area of social interaction, the Plaintiff had no significant limitations in the abilities to ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, but moderate limitations in the abilities to interact appropriately with the general public and get along with coworkers and peers without distracting them or exhibiting behavioral extremes. In the area of adaption, the Plaintiff had no significant limitations in the ability to be aware of normal hazards and take appropriate precautions; travel in unfamiliar places and use public transportation, and set realistic goals and make plans independently of others, but moderate limitations in the ability to respond appropriately to changes in the work setting. (R:94-96)

Dr. Eeltink opined that in the area of understanding and memory, the Plaintiff "would be able to remember and carry out short and simple instructions," but "may have some difficulty with more complex instructions due to reduced concentration." (R: 96) In the area of sustained concentration and persistence, she stated that although the Plaintiff "may be apt to have lapses in focus, motivation and reliability, the frequency, intensity and duration of these occurrences would not be expected to significantly or routinely distract from [the Plaintiff's] ability to

execute/complete simple, routine (vs. complex) occupational tasks at a reasonable pace under normal supervision." Id.  The doctor added that the Plaintiff "would be able to maintain attention and concentration for at least 2 hours at a time as required for the performance of simple tasks." Id. Regarding the area of social interaction, these "skills may be somewhat limited at times, however [the Plaintiff] appears capable of performing simple tasks in an environment with limited interpersonal contact" and "is able to cooperate on simple, routine tasks, accept directions/feedback and relate acceptably on a superficial level." Id.  Finally, in the area of adaptation, the Plaintiff "may have some difficulty adapting to change due to limited stress tolerance." Id.

An identical Mental Residual Functional Capacity Assessment of the Plaintiff at the reconsideration level was made by David Tessler, Psy.D., another state agency non-examining psychologist, on July 12, 2017.  (R: 110-13)

3. Consultative Examination by Kelley A. Gill, Ph.D.

A consultative examination of the Plaintiff by Kelley A. Gill, Ph.D., was performed on December 17, 2018.  Dr. Gill conducted an interview and mental status examination, and reviewed Dr. Besner's report as well as progress notes from Henderson Behavioral Health.  The doctor observed that the Plaintiff was cooperative and forthcoming with information, although there was variability in effort.  He was generally alert with no apparent difficulty in comprehension, although his speech was slow. The Plaintiff's mood was somewhat euthymic with congruent affect.  His thought processes were logical and goal directed, without any evidence of loose associations or tangential or circumstantial thinking. The Plaintiff's abstraction ability was poor and his general fund of knowledge was fair.  He was unable to perform simple mathematical calculations.  The Plaintiff denied any visual or tactile hallucinations or

homicidal ideation, but reported auditory hallucinations and passive suicidal thoughts. His insight and judgment were likely poor to fair. (R:475)

Dr. Gill noted that the Plaintiff was the sole provider of background and historical information. While at times he appeared to be working toward his maximum capability, on other occasions his performance fluctuated. As a result, the doctor stated that the results of her evaluation "may not be a valid and reliable reflection of his optimal ability." Id. The Plaintiff reported that he had been diagnosed at Henderson with schizophrenia and paranoia, with symptoms beginning when he was 37 years old. He had been taking Rexulti and Prozac since 2016 and these medications were effective. The Plaintiff told Dr. Gill that he was able to care for his personal activities of daily living and was able to cook, clean and groom himself. He had no difficulty managing his money. His typical day consisted of walking in the park and watching television. The Plaintiff was raised by his grandmother, as his mother had addiction issues and his father had a history of incarceration. At the time of the examination, the Plaintiff was living with, and supported by his father. He did not have a driver's license as his license was suspended in 2016 in connection with a drug possession charge. The Plaintiff had a history of suspensions from school and received special education services throughout his schooling. He reported having been expelled for truancy. (R:475-76)

The Plaintiff denied using tobacco, alcohol or drugs. He stated that he had a history of cocaine use, but had been clean since 2016 after receiving substance abuse treatment. The Plaintiff reported having an extensive criminal record, with convictions for possession of drugs with intent to sell, aggravated battery and aggravated assault. At the time of the examination, he was on probation, which would continue for another 4 years. The Plaintiff also reported attending medical

9

management appointments at Henderson every 2 months, as well as biweekly therapy sessions.  He related that he had been involuntarily committed in 2016 and 2017.  His current symptoms of depression were feelings of guilt and worthlessness; loss of concentration and energy; passive suicidal thoughts without intent or plan, and crying and irritability.  Although the Plaintiff continued to hear voices commanding him to do things, he was able to remain calm and dismiss the voices as the result of his medication's effectiveness.   The Plaintiff denied experiencing excessive worry, restlessness or fatigue as well as symptoms associated with mania.  He told Dr. Gill that he enjoyed watching football and basketball, being in nature and swimming. (R:477)

Dr. Gill administered the Folstein Mini Mental Status Exam (MMSE) to assess his orientation to time and place; encoding and recall of three words; attention; language skills, and constructional skills.  The Plaintiff's raw score was 15 out of 20.  He was partially oriented as to time and place; demonstrated intact immediate recall, but poor recent recall; struggled with tasks of attention and calculation; showed mild constructional dyspraxia, and was unable to successfully follow either a simple or complex command.  Dr. Gill's diagnosis was Major Depressive Disorder, recurrent episode, severe, with psychotic features and Rule Out intellectual disability.  His prognosis was likely guarded/fair if he continued to receive mental health treatment and psychiatric care.  Owing to the possibility of cognitive impairment, a third party payee might be needed to manage the Plaintiff's funds.  (R:478)

On December 21, 2018, Dr. Gill completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental).  In the area of understanding, remembering and carrying out instructions, she opined that the Plaintiff had mild limitations in the abilities to understand and remember simple instructions; carry out

simple instructions; make judgments on simple work-related decisions, and understand and remember complex instructions. The Plaintiff had marked limitations in the abilities to carry out complex instructions and to make judgments on complex work-related decisions, based on his cognitive limitations and history of difficulty with judgment. The Plaintiff also had moderate limitations in the abilities to interact appropriately with the public, supervisors and co-workers, and marked limitations in the ability to respond appropriately to usual work situations and changes in a routine work setting as the result of his historical difficulties with self-regulation and impulse control. (R:471-72)

C. <u>Hearing Testimony</u>

1. <u>Plaintiff</u>

At the initial administrative hearing, the Plaintiff testified that he suffered from depression and heard voices. He stated that he last drank alcohol or used marijuana 2 ½ years prior to the date of the hearing (November 27, 2018). He did not attend NA meetings, but on November 1, 2018, he completed a drug rehabilitation program at a place called Alliance in Tamarac, Florida. The Plaintiff took two medications daily to keep him calm: Prozac and Rexulti. (R:51, 53-56)

2. <u>Dr. Joseph Carver</u>

At the supplemental hearing on June 4, 2019, Dr. Joseph Carver, who reviewed the Plaintiff's mental health records, including the recent report from Dr. Gill, testified as an expert, without objection by the Plaintiff's counsel. The doctor began by noting that the Plaintiff was 42 years old with a 7th grade education. He had no competitive work history, but his prison record reflected that he had been employed for 11 months as a laborer. The Plaintiff had an extensive history of drug abuse, with his drugs of choice being cocaine and cannabis. At the time of Dr. Besner's evaluation

in 2016, the Plaintiff was using those drugs on a daily basis.  The Plaintiff also had an extensive criminal history with multiple drug related and other criminal behavior. (R:69-70)

       Dr. Carver stated  that there were significant mental health allegations in the medical record that were inconsistent.  The Plaintiff had one psychiatric hospitalization in 2017, where he arrived at the hospital in a combative, overtly psychotic state.  Drug tests at the time were positive for cocaine and cannabis.  The Plaintiff randomly sought mental health treatment at Henderson, but with very little consistency.  There was a diagnosis of schizoaffective disorder, with alleged auditory and visual hallucinations, but no other psychotic symptoms.  Nor was there any consistent pattern of depression in the medical record.  Dr. Carver saw nothing in the record to suggest a schizophrenia or any psychotic disorder, suggesting that the Plaintiff's symptoms, if valid, were drug induced.  (R:70)

       As to depression and bipolar disorders, Dr. Carver pointed out that there was a diagnosis of Major Depressive Disorder, Recurrent, Severe with psychosis, the latter based on the Plaintiff's reports of hearing voices.  There were no consistent depressive symptoms in the record, nor was there consistent use of an anti-depressant. Dr. Carver did not believe there was any evidence of chronic depression. Moreover, there was no evidence of bipolar disorder, with the Plaintiff's symptoms more consistent with cocaine use, which can artificially induce a manic state for a short period of time.  (R: 70-71)

       As to intellectual disability, the doctor noted that the Plaintiff alleged he was unable to follow simple instructions, and at the time of his first consultative examination he stated that he could not bathe without assistance and could not perform chores or routine activities.  However, while in prison, the Plaintiff tested in

12

the borderline range.  He has had a driver's license and there was no evidence in the record of intellectual retardation.  (R:71)

Finally, as to personality disorder and impulse control disorder, the Plaintiff did have a disregard for, and violation of the rights of others, as well as recurrent impulsive behavioral outbursts.  Thus, the Plaintiff exhibited the "A criteria" for a personality disorder.  As to the "B criteria," the Plaintiff's ability to understand, remember and apply information was mildly impaired.  While he offered minimal effort in psychological testing, he responded adequately to questions by physicians and other medical professionals.  The Plaintiff was moderately impaired in his ability to interact with others as the result of strong anti-social personality features, but was able to relate to care givers once detoxified.  Dr. Carver found that the Plaintiff had a mild ability to concentrate, persist and maintain pace, partially owing to his medication.  Finally, the Plaintiff's ability to adapt and manage himself was inconsistently represented in the medical record, as evidenced by the Plaintiff's conflicting reports of his capabilities during the two consultative examinations.  Accordingly, Dr. Carver concluded that the Plaintiff did not have a mental impairment that met or equaled any of the mental health listings. (R:71-72)

Dr. Carver opined that in the workplace, the Plaintiff's primary restrictions would be in interacting with others.  Therefore, he should have only occasional contact with the public, co-workers and supervisors.  He also would be limited by his 7th grade education.  Accordingly, Dr. Carver agreed with the ALJ that the Plaintiff would be restricted to "simple, routine, competitive low stress repetitive tasks on a sustained basis over a normal eight-hour workday in a stable work environment with no more than simple decision making required; occasional close interpersonal interactions with coworkers, and occasional interaction with supervisors

and the public.  The Plaintiff was unable to perform complex and detailed tasks or to meet fast paced, high production demands." (R:73)

On cross examination by counsel for the Plaintiff, Dr. Carver testified that the record refuted the Plaintiff's claim that he had not used drugs since 2016, since at the time of the Plaintiff's January 2017 hospitalization his drug screen was positive for cannabis and cocaine.  Additionally, between July and November 2018, the Plaintiff made one visit to Alliance Counseling and Outreach Center, but the record was devoid of any drug screen evidence after January 2017.  Dr. Carver disagreed with the report of one psychologist that the Plaintiff was unable to follow simple instructions, since the interview itself consisted of simple instructions.  Dr. Carver found that the record contained no evidence that the Plaintiff had marked limitations in the area of responding to work situations and changes.  He pointed out that if the Plaintiff was not toxic on substances, he handled medical requests and personal interactions well, and was not maladjusted.  The Plaintiff would, however, have a moderate impairment in his ability to interact with the public, supervisors and co-workers.  (R: 74-76)

3. Vocational Expert

Gary Fannin, a vocational expert (VE) was asked to consider an individual who could lift/carry 20 pounds occasionally and 10 pounds frequently; sit, stand or walk for 6 hours during an 8-hour workday; occasionally climb stairs and ramps, balance, stoop, kneel, crouch or crawl; never climb ladders, ropes or scaffolds; avoid all exposure to unprotected heights; only frequently use his right hand for handling, grasping, fingering and feeling, with no limitations in the use of his left hand; occasionally operate foot controls with either foot; perform simple, routine, competitive, low stress, repetitive tasks on a sustained basis over a normal 8-hour workday in a stable work environment with no more than simple decision making required;

occasionally interact with supervisors, co-workers and the public, and unable to perform complex or detailed tasks or meet fast paced, high production demands. The VE testified that such a person could perform the jobs of cafeteria attendant and routing clerk, jobs rated as SVP 2 and existing in large numbers in the national economy. (R:78-79) Although not reflected in the transcript (possibly as the result of an error in recording or transcription), the VE apparently also identified the job of marker because the ALJ asked the VE to describe that job. (R:79) The VE stated that he relied on the Dictionary of Occupational Titles (DOT) and that there were no inconsistencies between the VE's answers to the ALJ's questions and the DOT. (R:79-80)

In response to questions posed by counsel for the Plaintiff, the VE stated that an individual who would be off-task for 15% (or any amount greater than 10%) of a workday or absent for more than 1 day per month would not be able to perform any job. Additionally, a person who could less than occasionally interact with supervisors could not perform any job. There are, however, jobs which do not require interaction with co-workers or the public. (R:80-81)

### III. DECISION OF THE ALJ

The ALJ first found that the Plaintiff had not engaged in any substantial gainful activity since March 21, 2017, the date of his SSI application and had a combination of severe impairments consisting of degenerative disc disease of the lumbar spine; right hand arthropathy; major depressive disorder with psychosis, and history of polysubstance use disorders. The ALJ noted Dr. Carver's hearing testimony that the Plaintiff had drug-induced psychosis and depression, with no clinical evidence of either impairment absent the use of substances. Dr. Carver further found that there was no evidence of mental retardation, and despite some elements of a personality

disorder, the Plaintiff's overall mental impairments caused no more than moderate limitation in the area of interacting with others; mild limitations in the areas of understanding, remembering or applying information and in concentrating, persisting or maintaining pace, and no limitation in the area of adapting and managing himself. As a result, the ALJ found that the Plaintiff's only severe mental impairment was Major Depressive Disorder with psychosis, which also was supported by treatment notes from Henderson Behavioral Health. (R:14-15)

Next, the ALJ found that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. In finding that the Plaintiff's mental impairment did not meet or medically equal a listing, the ALJ first determined that the Plaintiff had moderate limitations in the areas of understanding, remembering and applying information. The ALJ based this on the 2016 consultative examination by Dr. Besner and the 2018 consultative examination of Dr. Gill. The ALJ noted, however, that Dr. Gill had cautioned that owing to variable effort by the Plaintiff, her examination results might not be a valid and reliable reflection of his optimal ability. The ALJ also pointed out that the Plaintiff had told Dr. Besner that he could not take care of his personal needs, but informed Dr. Gill that he not only could care for his personal needs, but also could cook, clean, groom himself and manage money. Finally, the ALJ observed that the mental status examinations at Henderson revealed that the Plaintiff had no significant or disabling cognitive deficits, and he consistently had demonstrated his ability to provide medical and other information, including at the administrative hearing. (R:15-16)

The ALJ found that in the area of interacting with others, the Plaintiff also had moderate limitation. The ALJ mentioned that despite record evidence of

altercations, agitation, hostility or lack of cooperation with hospital staff during short-stay hospitalizations involving substance uses, the Plaintiff had been cooperative with the two consultative examiners and demonstrated appropriate behavior at both hearings.  The ALJ also found that the Plaintiff had moderate limitations in the area of concentrating, persisting or maintaining pace, despite Dr. Carver's assessment that the Plaintiff's limitation in this area was mild.  The ALJ believed that the assessments of the state agency psychologists and consultative examiners was consistent with a moderate limitation.  Additionally, Henderson treatment notes indicated that the Plaintiff's attention and concentration was fair overall.  (R:16-17)

In the area of adapting and managing himself, the ALJ found that the Plaintiff's limitation was mild, despite Dr. Carver's assessment of no limitation.  The ALJ determined that a mild limitation was consistent with the opinions of the state agency psychologists.  The ALJ noted that the record showed no significant or extended psychiatric hospitalizations, and the Plaintiff's involuntary commitments were drug-related.  The ALJ relied on Henderson treatment notes for the proposition that the Plaintiff's symptoms were better managed after he stopped using substances and was medically compliant.  (R:17)

The ALJ next determined that the Plaintiff retained the residual functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently; sit or stand/walk for 6 hours during an 8-hour workday; occasionally climb stairs or ramps, but never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; never work around unprotected heights; only frequently handle and perform fine manipulation with the right upper extremity, and occasionally operate foot controls with both lower extremities.  The Plaintiff could perform simple routine, competitive, low stress, repetitive tasks on a sustained basis during a normal workday,

17

in a stable environment with no more than simple decision making required; could have occasional close interpersonal interactions with co-workers, supervisors and the public, but could not perform complex and detailed tasks or meet fast-paced high production demands. In formulating this assessment, the ALJ found that although the Plaintiff's medically determinable impairments reasonably could be expected to cause the symptoms he alleged, the Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical and other evidence of record. (R:18-19)

   The ALJ stated that support for the Plaintiff's mental residual functional capacity could be found in the notes from Henderson, the consultative examinations and one short-stay hospitalization which revealed that the Plaintiff suffers from Major Depressive Disorder with psychosis. While the Plaintiff did have moderate functional limitations in some areas, these did not preclude all work, but only work involving complex or detailed tasks, production-type work and work requiring frequent or greater interactions with people in the workplace. Henderson treatment notes showed that when the Plaintiff complied with treatment by attending appointments, taking medications as prescribed and abstaining from substance use, his symptoms improved. Moreover, during the gap in the Plaintiff's treatment at Henderson in 2018, there was no evidence of decompensation or the need for crisis intervention or hospitalization owing to exacerbation of his depression with psychosis. (R:20)

   The ALJ noted that Dr. Carver had testified that the Plaintiff's primary issues would be in the area of interacting with others. As a result, the residual functional capacity limited the Plaintiff to occasional contacts and simple routine tasks. The ALJ gave great weight to Dr. Carver's opinion, despite some disagreement with Dr. Carver's assessment of limitations in some broad areas of functioning, because

18

that opinion was consistent with and supported by the evidence of record.  The ALJ noted that the state agency psychologists had opined that the Plaintiff could remember and carry out short and simple instructions, but would have difficulty with more complex instructions; perform simple tasks at a reasonable pace under normal supervision; maintain attention and concentration for at least 2 hours; and cooperate on simple routine tasks, accept directions/feedback and relate acceptably on a superficial level with limited interpersonal contacts.  The ALJ accorded partial weight to these assessments to the extent they were consistent with the evidence reviewed by the state agency psychologists, but there were portions of the assessments that were unclear.  As an example, it was not clear what was meant by "limited" interpersonal contact, which the ALJ interpreted as meaning occasional interactions with others and no production-type work.  (R:20-21)

The ALJ acknowledged that Dr. Besner had opined that the Plaintiff might not be able to perform some of the duties required by a workplace owing to his current emotional state and low cognitive abilities.  The ALJ gave little weight to this opinion because he found it to be overly broad and vague, and because Dr. Besner had not performed intelligence/cognitive testing to support her assessment of low cognitive abilities.  (R:21)

The ALJ pointed out that Dr. Gill had assessed the Plaintiff as being mildly (meaning slightly) limited in his ability to perform (i.e., understand, remember, carry out or make judgments relating to) simple tasks; markedly limited in his ability to respond appropriately to usual work situations and to changes in a routine work setting owing to a history of difficulties with self-regulation and impulse control; moderately limited in his ability to interact appropriately with the public, supervisors and co-workers.  The ALJ gave some weight to Dr. Gill's opinion, except with regard

19

to her assessment that the Plaintiff had marked limitation in responding appropriately/adapting to routine work. The ALJ pointed out that Dr. Gill had examined the Plaintiff only once, with noted issues with validity and reliability of performance, and had not considered the full record. Id. The ALJ concluded:

> In sum, the medical record did not support [the Plaintiff's] allegations of limitations to the extent that he would be unable to perform work on a sustained basis. Any such limitations were therefore likely self-imposed or overstated. Moreover, [the Plaintiff's] lack of employment appears mainly due to a lengthy legal history with incarcerations, rather that due to any medical disability, with no genuine or sustained evidence of appropriate treatment. [The Plaintiff] alleged an onset date in 2008; however, the Henderson notes showed that he was only seen from November 2016 to January 2019 (with gaps in treatment in 2018). Accordingly, prior to 2016, [the Plaintiff] did not participate in formal mental health treatment. . . . Accordingly, the available evidence is insufficient to establish disability as alleged by [the Plaintiff].

Id. (record citations omitted)

Lastly, the ALJ found that the Plaintiff had no past relevant work, but based on the testimony of the VE, there were jobs existing in significant numbers in the national economy that the Plaintiff could perform: cafeteria attendant, marker and routing clerk. The ALJ further found that the VE's testimony was consistent with the information contained in the DOT. Accordingly, the Plaintiff was not under a disability for purposes of the Social Security Act during the relevant time period.

## IV. CROSS MOTIONS FOR SUMMARY JUDGMENT

The Plaintiff seeks reversal or remand on two interrelated grounds: (1) the ALJ's residual functional capacity assessment was not based on substantial evidence because it failed to incorporate the opinions of examining and non-examining psychologists that the Plaintiff could understand and carry out only short and simple instructions, and (2) the ALJ erred by failing to resolve the apparent conflict with the

VE's testimony and the DOT because the jobs identified by the VE were listed as SVP 2, which requires an ability to carry out more than short and simple instructions.

The Commissioner contends that the decision of the ALJ must be affirmed because it is supported by substantial evidence and the correct legal standards were applied.

## V. RECOMMENDATIONS OF LAW

At issue before the Court is whether the final decision of the Commissioner, as reflected by the record, is supported by substantial evidence. "Even if the evidence preponderates against the Secretary, we must affirm if the decision is supported by substantial evidence." Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1985). Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389 (1971); Bloodsworth v. Heckler, 703 F.2d 1233 (11th Cir. 1983). The Court must review the record as a whole to determine if the decision is supported by substantial evidence. Bloodsworth, 703 F.2d at 1239. The Court must also determine whether the Administrative Law Judge applied the proper legal standards. No presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993) (citing Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987)).

In making a disability determination, the ALJ must perform the sequential evaluation outlined in 20 C.F.R. § 404.1520. First the claimant must not be engaged in substantial gainful activity after the date the disability began. Second, the claimant must provide evidence of a severe impairment. Third, the claimant must show that the impairment meets or equals an impairment in Appendix 1 of the Regulations. If the claimant fails to provide sufficient evidence to accomplish step

three, the analysis proceeds to step four.  In step four, the ALJ must determine the claimant's residual functional capacity, then determine if the claimant can perform his or her past relevant work.  The claimant has the burden of proving the inability to perform past relevant work. If the claimant's evidence shows an inability to perform past relevant work, the burden shifts to the ALJ in step five.  The ALJ must show that there is other gainful work in the national economy which the claimant can perform.  Once the ALJ identifies such work, the burden returns to the claimant to prove his or her inability to  perform such work.

A. <u>Residual Functional Capacity</u>

The ALJ found, regarding the Plaintiff's mental impairment, that he retained the residual functional capacity "to perform simple routine, competitive, low stress, repetitive tasks on a sustained basis during a normal workday, in a stable environment with no more than simple decision making required; could have occasional close interpersonal interactions with co-workers, supervisors and the public, but could not perform complex and detailed tasks or meet fast-paced high production demands." (R:18)  The Plaintiff contends that the ALJ's residual functional capacity assessment was not based on substantial evidence because the ALJ improperly failed to include the state agency psychologists' assessment that the Plaintiff was limited to remembering and carrying out short and simple instructions, and failed to provide sufficient reasons for not fully crediting the opinions of the consulting psychologists.

As to cases filed before March 27, 2017, the evaluation of medical opinions is governed by 20 C.F.R. § 404.1527(c), which provides that medical opinions other than treating source opinions which are accorded controlling weight are evaluated based on the following factors: (1) examining relationship; (2) treatment relationship (including length of treatment relationship and frequency of examination, and nature

and extent of treatment relationship); (3) supportability in the medical record; (4) consistency with the record as a whole; (5) the source's area of specialization, and (6) other factors which tend to support or contradict the medical opinion.  Pursuant to 20 C.F.R. § 404.1527(c)(2), the ALJ "should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."

1. State agency psychologists

The Plaintiff focuses on the state agency non-examining psychologists' opinion that in the area of understanding and memory, the Plaintiff "would be able to remember and carry out short and simple instructions," but "may have some difficulty with more complex instructions due to reduced concentration."  (R: 96, 112) The undersigned notes that in the area of sustained concentration and persistence, these psychologists stated that although the Plaintiff "may be apt to have lapses in focus, motivation and reliability, the frequency, intensity and duration of these occurrences would not be expected to significantly or routinely distract from [the Plaintiff's] ability to execute/complete simple, routine (vs. complex) occupational tasks at a reasonable pace under normal supervision." Id.

In his decision, the ALJ acknowledged that the state agency psychologists had opined that the Plaintiff could remember and carry out short and simple instructions, but would have difficulty with more complex instructions; perform simple tasks at a reasonable pace under normal supervision; maintain attention and concentration for at least 2 hours; and cooperate on simple routine tasks, accept directions/feedback and relate acceptably on a superficial level with limited

interpersonal contacts.  The ALJ accorded partial weight to these assessments to the extent they were consistent with the evidence the psychologists reviewed.  The ALJ also pointed out that some portions of their opinions were unclear, citing as an example that it was unclear what was meant by "limited interpersonal contacts," which the ALJ interpreted as meaning "occasional" contacts with others and no production-type work.

The undersigned finds that the residual functional capacity assessment made by the ALJ rightly focused on the kinds of tasks he could perform, i.e., simple routine, competitive, low stress, repetitive tasks in a stable environment with no more than simple decision making required.  This is fully consistent with the opinions of the state agency psychologists that the Plaintiff could perform simple tasks at a reasonable pace under normal supervision.

Since the ALJ was evaluating the record as a whole, including all of the opinion evidence, he was not required to incorporate any opinion word for word. Indeed, while according great weight to Dr. Carver's opinion, the ALJ found, based on the record as a whole, that the Plaintiff was more limited in certain areas than Dr. Carver had assessed. Moreover, as the Commissioner points out, the state agency psychologists did not state that the Plaintiff could not understand and remember more than short, simple instructions, but stated only that he might have some difficulty with more complex instructions owing to decreased concentration.  The undersigned finds that the ALJ's decision not to limit the Plaintiff to understanding and remembering only short and simple instructions was not error.

2. Consultative examining psychologists

The Plaintiff also argues that the ALJ failed to articulate sufficient reasons for not fully crediting the opinions of the consultative psychologists, Dr. Besner and Dr. Gill.  As to the opinion of Dr. Besner, the ALJ acknowledged that Dr. Besner

had opined that the Plaintiff might not be able to perform some of the duties required by a workplace owing to his current emotional state and low cognitive abilities. The ALJ gave little weight to this opinion because he found it to be overly broad and vague, and because Dr. Besner had not performed intelligence/cognitive testing to support her assessment of low cognitive abilities. The Plaintiff argues that the ALJ's reasons for rejecting Dr. Besner's opinion were insufficient.

The undersigned notes that the portion of Dr. Besner's report to which the ALJ referred was her assessment of the Plaintiff's ability to work, as opposed to her observations of the Plaintiff during the examination. The undersigned agrees with the ALJ that this assessment was vague and overly broad and was not supported by objective tests or any record evidence existing at the time of Dr. Besner's examination of the Plaintiff in November 2016. The undersigned notes that, at that time, the Plaintiff admitted to Dr. Besner that he was a daily user of cocaine and cannabis, and reported was unable to bathe or dress without assistance, and could not shop, cook or clean house. Accordingly, the undersigned finds that the ALJ articulated sufficient reasons for rejecting Dr. Besner's assessment of the Plaintiff's limitations.

As to Dr. Gill, the ALJ noted that she had assessed the Plaintiff as being mildly (meaning slightly) limited in his ability to perform (i.e., understand, remember, carry out or make judgments relating to) simple tasks; markedly limited in his ability to respond appropriately to usual work situations and to changes in a routine work setting owing to a history of difficulties with self-regulation and impulse control; moderately limited in his ability to interact appropriately with the public, supervisors and co-workers. The ALJ gave some weight to Dr. Gill's opinion, except with regard to her assessment that the Plaintiff had marked limitation in responding appropriately/adapting to routine work. The ALJ pointed out that Dr. Gill had

examined the Plaintiff only once, with noted issues with validity and reliability of performance, and had not considered the full record.

Thus, the ALJ credited Dr. Gill's assessment except for her opinion that the Plaintiff had marked limitations in the area of his ability to respond appropriately to usual work situations and to changes in a routine work setting, citing issues of validity and reliability of performance. In her report, Dr. Gill noted that the Plaintiff was the sole provider of background and historical information. While at times he appeared to be working toward his maximum capability, on other occasions his performance fluctuated. As a result, the doctor stated that the results of her evaluation "may not be a valid and reliable reflection of his optimal ability." This qualifier, together with the fact that Dr. Gill had examined the Plaintiff on only one occasion and had not had the opportunity to consider evidence submitted after December 2018, constituted a sufficient basis for the ALJ to reject Dr. Gill's opinion in a single area of mental functioning.

The undersigned finds that the ALJ's residual functional capacity assessment of the Plaintiff was based on consideration of all the opinion evidence, as well as progress notes of the Plaintiff's limited and sporadic mental health treatment at Henderson, and is supported by substantial evidence.

B. Apparent Conflict Between VE Testimony and the DOT

The Plaintiff's second and final argument is that the ALJ erred by failing to address the apparent conflict between the Plaintiff's residual functional capacity as assessed by the ALJ and embodied in the hypothetical posed to the VE, and the VE's testimony that the Plaintiff could perform jobs at an SVP (reasoning) level of 2, as mandated by Washington v. Comm'r of Soc. Sec., 906 F.3d 1353 (11th Cir. 2018). In

26

that case, the appellate court construed the responsibility of the ALJ as governed by SSR 00-4p, 2000 WL 1989704:

> SSR 00-4p imposes a duty on ALJs to identify and resolve apparent conflicts between DOT data and VE's testimony, and this duty is not fulfilled simply by taking the VE at his word that his testimony comports with the DOT when the record reveals an apparent conflict between the VE testimony and the DOT. Rather, as we see it, the ALJ has an affirmative obligation to identify any "apparent" conflict and to resolve it. The failure to properly discharge this duty means the ALJ's decision is not supported by substantial evidence.

Id. at 1362.

The Plaintiff also contends that there is an apparent conflict between the DOT definitions of the other jobs identified by the VE because the DOT defines those jobs as requiring a reasoning level of 2, while the Plaintiff's residual functional capacity limited him to performing simple, routine, repetitive tasks. The DOT defines reasoning level 2 as requiring an individual to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." Dictionary of Occupational Titles, Appendix C, 1991 WL 688702. The Eleventh Circuit recently ruled that this definition does not exclude individuals who are capable of performing simple, routine tasks. Valdez v. Commissioner of Social Security, 808 F. App'x 1005, 1009 (11th Cir. 2020) (individual limited to simple, routine work could perform jobs at reasoning levels 1 and 2).

The Plaintiff's  argument actually hinges on his first assertion that the ALJ erred in formulating his residual functional capacity assessment by not limiting the Plaintiff to remembering and carrying out short and simple instructions. The Plaintiff cites Buckwalter v. Acting Comm'r of Soc. Sec., 997 F.3d 1127 (11th Cir. 2021), which

27

held that there was no apparent conflict with a residual functional capacity assessment which limited a claimant to the ability to understand, carry out and remember simple instructions with DOT reasoning level 2.  In so holding, the Eleventh Circuit stated that the "difference between levels one and two is the length of the instructions, with level one being limited to one- or two-step instructions, and level two not being limited in length." Id. at 1135 (emphasis in original) (citing Moore v. Astrue, 623 F.3d 599 (8th Cir. 2010) and Lawrence v. Saul, 941 F.3d 140 (4th Cir. 2019)).  The Buckwalter court did not address the issue of whether a residual functional capacity that limited a plaintiff to understanding, carrying out and remembering short and simple instructions can perform jobs at reasoning level two or is restricted to jobs at level one.  However, in an unpublished opinion issued before Buckwalter, the Eleventh Circuit held that a residual functional capacity assessment which limited the plaintiff to understanding, remembering  and carrying out short, simple instructions, corresponded to reasoning level one, creating an apparent conflict with the VE's testimony that the Plaintiff could perform jobs at a level two.  Albra v. Acting Comm'r of Soc. Sec., 825 F. App'x 704, 708-09 (11th Cir. 2020).

Thus, remand might be appropriate if the ALJ erred in failing to include in his residual functional capacity assessment that the Plaintiff was limited to understanding, carrying out and remembering  short, simple instructions.  However, the undersigned already has concluded that the ALJ did not err by failing to include this limitation.  Instead, the ALJ properly found that the Plaintiff could perform simple, routine, competitive, low stress, repetitive tasks  on a sustained basis during a normal workday, in a stable environment with no more than simple decision making required.  Under Valdez, there is no apparent conflict for the ALJ to resolve between

this residual functional capacity assessment and the VE's testimony that the Plaintiff could perform jobs at DOT reasoning level two.

Accordingly, the undersigned concludes that the ALJ's residual functional capacity assessment was supported by substantial evidence in the record, and there was no apparent conflict between the VE's testimony and the DOT. Therefore, there is no basis to reverse or remand the decision of the ALJ that the Plaintiff was not under a disability for Social Security Act purposes during the relevant time period.

## VI. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the Commissioner's Motion for Summary Judgment (ECF No. 24) be GRANTED, and the Plaintiff's Amended Motion for Summary Judgment (ECF No. 33) be DENIED.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William P. Dimitrouleas, United States District Judge. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained therein, except upon grounds of plain error if necessary in the interest of justice. See 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140, 149 (1985); Henley v. Johnson, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 10th day of August, 2021.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record